CORTIÑAS, J.
 

 Eduardo Galego was a sex offender on probation who was living under the Julia Tuttle Causeway. On the night of January 24, 2008, Galego missed his 10 p.m. curfew by three hours. Galego’s cell phone records show that he had attempted to call his probation officer, Lorenzo Salazar, twice, at 10:00 p.m. and 10:05 p.m., but did not leave a message. At 1:00 a.m., Galego spoke to Salazar and explained that he was ill, had fallen asleep on a bus, and had missed his bus stop. From 2:20 a.m. until 6:25 a.m., Galego was at the Mount Sinai Hospital emergency room being treated for his illness. Galego was found to have violated his probation and sentenced to twenty-five years in prison. We reverse.
 

 
 *153
 
 The State offered evidence to support Salazar’s theory that Galego had missed curfew willfully because he had spent the afternoon drinking at a party. First, Salazar testified that when he had spoken with Galego that afternoon, he had heard “some music” and “a lot of noise and other people in the background,” which gave him the impression that Galego was at a party. On cross-examination, Salazar admitted that this was “just a guess.” Second, the reason Galego gave for missing his curfew was that he had fallen asleep on a bus. Third, Salazar stated that when Galego had said that he felt “really sick” and wanted to go to the hospital, he “didn’t sound well,” and “his speech was impaired somewhat.” Finally, when Salazar interrogated Galego the next morning, his answers “didn’t make any sense,” and a saliva screen for alcohol tested positive.
 
 [1]
 
 Based on this evidence and the allegation that Galego had failed to call Salazar until three hours after his curfew, the very able trial judge concluded that Galego’s hospital visit was meant to cover up his drinking.
 

 The court made this ruling despite referring to the testimony of Galego’s expert witness, Dr. Pedro Jose Greer, as “honest and fourth coming [sic].” Dr. Greer,
 
 [2]
 
 a renowned physician in Miami, cited voluminous medical data completely antipodean to Salazar’s hypothesis that Galego had been drinking. Although Dr. Greer had never met Galego prior to the hearing at which he testified, he had reviewed the lab results from Galego’s emergency room visit the night in question.
 

 Q [D]id you see anything in those medical records that indicated that Mr. Gallego [sic] had anything to drink or was it [sic] drunk that night?
 

 A There was no documentation in the chart or anything of that nature.
 

 Q And based on your experience as a doctor, there probably would be, right?
 

 A One hundred percent. You would always document that....
 

 To the contrary, Dr. Greer testified that results from tests of Galego’s liver showed that his “liver enzymes were completely normal,” whereas in someone who had been drinking, “[y]ou would expect A.S.T. That’s a very sensitive enzyme ... [that] would generally bump up with alcohol.” Dr. Greer noted that Galego’s records showed no documentation of elevated liver enzymes, nor did they show that he smelled like alcohol.
 

 Dr. Greer testified that Galego’s impaired speech and odd behavior could be explained by the fact that he has suffered from diabetes for the past seventeen years: if a diabetic has a cold, a virus, or any other infection, such as the one that prompted Galego’s cousin to give him Robitussin, their blood sugar would become elevated, as was Galego’s,
 
 [3]
 
 and they would suffer “a change in their mental status, a change in their normal behavior, maybe their speech is slurred, maybe they’re confused, maybe they can’t answer a question or stay concentrated.” This “[a]ltered mental status” would include seizures and
 
 *154
 
 not understanding what was going on. Additionally, Dr. Greer said that Galego “was a little mind depleted as you can tell by his B.U.N. or BUN [Blood Urea Nitrogen].” Furthermore, Dr. Greer testified that Galego’s elevated B.U.N. and “mildly elevated lite pace with abnormal hema-lades” showed that “he was a little volume depleted” and had a stomach virus, which explained why he fell asleep on the bus.
 
 [4]
 

 Dr. Greer further testified that Galego’s urinalysis “showed some bacteria with low WBCs, [which] could mean he [had] a UTI or a stone” and that diabetics with a urinary tract infection “get a lot of a false positive readings” when their urine is tested for alcohol. He said that the test Salazar used is not a direct test of alcohol, and the correct procedure would have been to use “[a] pure blood alcohol [test]” to confirm it. No blood alcohol test was given to Galego.
 

 In addition to Dr. Greer’s testimony, Galego’s cousin testified that Galego “doesn’t drink” and that she had not known him to drink anywhere. Salazar himself testified that he had never smelled alcohol on Galego’s breath and had always found him to be sober.
 

 It is the State’s burden to prove, by the greater weight of the evidence, that a probation violation is a willful and substantial one.
 
 Hines v. State,
 
 789 So.2d 1085, 1086 (Fla. 2d DCA 2001). However, rather than provide substantial and competent evidence to prove its case, here the State relied upon sheer conjecture.
 
 See Dean v. State,
 
 948 So.2d 1042, 1045 (Fla. 2d DCA 2007) (holding that where there was no direct evidence regarding probationer’s alcohol consumption, and “the only direct evidence presented was to the exact contrary,” the State failed to prove willful and substantial violation). Based on Dr. Greer’s unrebutted testimony, which showed that Galego missed his curfew because of issues with diabetes and not because he had been drinking, we hold that the State did not, as a matter of law, satisfy its burden to prove the probation violation by a preponderance of the evidence.
 

 This opinion shall take effect immediately, notwithstanding any motions for rehearing.
 

 Reversed and remanded.
 

 [1]
 

 . Although the onsite full panel drug and alcohol tests both were negative.
 

 [2]
 

 . Dr. Greer is a board certified intern, gas-troenterologist, hepatologist, and chief of gas-troenterology at Mercy Hospital, and Assistant Dean of Academic Affairs at the College of Medicine at Florida International University.
 

 [3]
 

 .Tests show that Galego's urine contained glucose levels of 2000 milligrams per decimeter; a normal urine glucose level is zero. His blood contained 310 milligrams of glucose, whereas a normal blood glucose level is between 74 and 106.
 

 [4]
 

 . Q And if somebody's blood sugar is high and they have a fever and they're sick and all these other symptoms, diarrhea and such, can they get sleepy and drowsy and fall asleep?
 

 A Yes. And that's a consequence of them losing volume.